**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

RUI CARVALHO,

       Plaintiff,

v.

KILOLO KIJAKAZI,[1] Acting
Commissioner of the Social
Security Administration,

       Defendant.

No. 20-cv-10240-DLC

<u>**ORDER ON PENDING MOTIONS**</u>

CABELL, U.S.M.J.

## I.  <u>INTRODUCTION</u>

Plaintiff Rui Carvalho seeks an order reversing a decision of the Commissioner of the Social Security Administration (the "Commissioner" of the "SSA") denying his application for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) based on physical disabilities.  (D. 18).  The Commissioner in turn seeks an order affirming her decision.  (D. 21).  At issue is whether the administrative law judge (ALJ) who heard his case erred (1) by substituting her lay opinion for a treating physician's medical opinion; and/or (2) by failing to

---

[1] The plaintiff brought this action against former Commissioner Andrew Saul; Andrew Saul is no longer the Commissioner and the court substitutes Acting Commissioner Kilolo Kijakazi for former Commissioner Saul.  *See* Fed. R. Civ. P. 25(d).

consider medical evidence regarding Carvalho's expected absences from work.  As discussed more fully below, the court, finding no basis to question the ALJ's determination, will grant the Commissioner's motion to affirm and deny the plaintiff's motion to reverse.

## II.  <u>PROCEDURAL HISTORY</u>

The plaintiff applied for DIB on March 29, 2016, and SSI on May 26, 2017, alleging a disability beginning on June 24, 2015, when he was 45 years old.  (SSA Administrative Record of the proceedings, pp. 196, 198 (R. __)).  The SSA denied the applications twice, first on October 28, 2016, and then again on April 25, 2017, following Carvalho's request for reconsideration. (R. 99, 107).  On April 8, 2019, an ALJ convened a hearing and, on July 5, 2019, found that Carvalho was not disabled within the meaning of the Social Security Act (Act).  (R. 15-28).  On December 10, 2019, the Appeals Council denied Carvalho's request for review of the ALJ's decision, making that decision the final decision for purposes of this appeal.  (R. 1).

## III. <u>FACTS</u>

### A. <u>BACKGROUND</u>

Carvalho attended school through 12th grade and previously worked as a carpenter.  (R. 91-92).  However, he has a history of back, neck, and shoulder issues and has not engaged in any substantial gainful activity for the past 15 years.  (R. 26).  He

previously applied for disability benefits in 2007 and 2013 but was found not disabled on both occasions. (R. 79). In the present application, Carvalho has alleged a disability based on herniated discs and pinched nerves, chronic pain, degenerative joint disease, sciatica and numbness in his left leg. (R. 79, 86).

### B. **RELEVANT MEDICAL EVIDENCE**

#### 1. **Treating Physicians**

##### a. *Shoulder*

In mid-August of 2013, Carvalho had surgery on his left shoulder to repair his rotator cuff as well as his superior and posterior labrum. (R. 306). On December 9, 2014, Carvalho visited his surgeon, orthopedist Barry Bickley, M.D., complaining of left shoulder pain.

Dr. Bickley noted that while Carvalho did reasonably well after his surgery, he reinjured his shoulder in an automobile accident in December 2013. (*Id.*). He further noted that while Carvalho complained of persistent shoulder pain and a popping sensation, Carvalho had been "lost to follow-up," missing several appointments for which he said he had no transportation. (*Id.*) Upon examination, Dr. Bickley suspected a recurrent labral tear and ordered a shoulder MRI to get a better image. (R. 306-07).

Carvalho underwent his MRI on December 24, 2014, which revealed mild tendinosis in his rotator cuff, but no tear, degenerative-type signal change of the superior labrum, and

3

attenuation of the long head of the biceps, consistent with a probable partial longitudinal tear. A small nondisplaced tear of the anterior labrum was also noted. (R. 318-19).

On June 1, 2015, Carvalho underwent shoulder arthroscopy along with carpel tunnel surgery, which had been indicated by a previous electromyography (EMG) and nerve conduction studies. (R. 303, 336). The shoulder procedure involved subsequent open biceps tenodesis. (R. 345). In a follow-up visit on June 9, 2015, Dr. Bickley observed that although Carvalho reported pain in his shoulder, both the shoulder and wrist were healing well. (R. 354).

While Carvalho complained of left shoulder pain to Dr. Bickley on September 30, 2015 (R. 370), Carvalho decided to hold off on any further shoulder procedures at that time. As detailed below, Carvalho's remaining visits with Dr. Bickley focused on spinal and hip issues.

###### b.   *Back and Hip Pain (Lumbar Spine)*

On December 30, 2014, Carvalho told Dr. Bickley that he was slated for spinal surgery with another provider but asked for a second opinion. (R. 322). Dr. Bickley found Carvalho vague on the nature of the spinal surgery, but he ordered a lumbar spine MRI to assess his leg pain and positive Lasègue's sign. (R. 320-24). However, the MRI was apparently declined by insurance in favor of physical therapy. (R. 327). At an exam on January 9, 2015, Dr. Bickley noted obvious discomfort in Carvalho's left hip

and lumbar region but 5/5 strength with muscle testing distally, and he gave Carvalho a spinal injection for pain.  (*Id.*).

On July 1, 2015, Carvalho underwent a lumbar MRI which revealed a circumferential bulge effacing the anterior posterior thecal sac at L4-5 with definite loss of joint space.  (R. 359). At L5-S1, a right paracentral bulge extending out of the right lateral recess was abutting and mildly impinging on the exiting right L5 nerve root.  Also, at L2-3, a broad-based bulge effacing the anterior posterior thecal sac disc extended out the left lateral recess, abutting the exiting left L2 never root with possible mild impingement.  (*Id.*).

Dr. Bickley found the MRI to indicate "multiple levels of degenerative disk disease and disk bulges" and expressed that Carvalho's pain in his left thigh could be due to the L2 issues. (R. 363).  Dr. Bickley said he would continue to monitor Carvalho's shoulder but recommended that Carvalho see a spine specialist about his back issues.  (*Id.*).

On September 30, 2015, Carvalho complained of right hip pain, and Dr. Bickley recommended a hip intra-articular injection (R. 371).  Carvalho did not return to Dr. Bickley's practice until August 29, 2016, when he saw Dr. Eugene Brady for the sudden onset of severe left hip pain.  Dr. Brady observed Carvalho in "obvious distress" and gave him a corticosteroid injection.  (R. 374-76). The following day, Carvalho saw Dr. Bickley, who observed marked

tenderness around the greater trochanter that was out of proportion to the lack of objective findings.  (R. 380).  Both his straight leg raise and Lasègue's sign were negative.

Carvalho saw Dr. Bickley again two weeks later and reported improvement in his left hip, but new pain in his right hip.  (R. 383).  Dr. Bickley found pain with straight leg raises but another negative Lasègue's sign and 5/5 motor strength distally in both lower extremities.  (*Id.*).

On September 30, 2016, Carvalho told Dr. Bickley his left hip had improved somewhat but he wanted another corticosteroid injection, which he received.  Dr. Bickley observed that Carvalho appeared much more comfortable than on previous visits (R. 385-86), and he noted continued improvement a month later, but referred Carvalho for studies to look for lumbar radiculitis.  (R. 389).

Carvalho had an EMG and nerve conduction study on January 20, 2017.  These procedures revealed that Carvalho had mild right and mild to moderate left chronic L5 radiculopathy without evidence of acute denervation, but there was no evidence of entrapment neuropathy or peripheral neuropathy on either side.  (R. 401).  In a follow-up visit on April 4, 2017, Dr. Bickley referred Carvalho to neurosurgery for further evaluation.  (R. 399).  This is the last visit to Dr. Bickley documented in the record.

     c.   ***Neck and Arm Pain (Cervical Spine)***

From late 2016 into 2017, Carvalho also saw his primary care

physician, Dr. James Nolan, for various health issues, including consultation on his lumbar spine and shoulder but focusing more on his cervical spine.  On February 28, 2017, Dr. Nolan noted that Carvalho asked for a second opinion on his cervical and lumbar issues, but Dr. Nolan had no MRI to review.  (R. 451).  On May 23, 2017, Carvalho visited Dr. Nolan for chest pain that was suspected to be musculoskeletal.  (R. 453).

Carvalho did not return to Dr. Nolan until December 1, 2017, when he had a pain assessment.  Dr. Nolan noted that most of Carvalho's pain was in his lower back and left arm and leg.  (R. 454).  Carvalho said a spine surgeon had recommended surgery, but he wanted to avoid surgery and seek a second opinion.  (*Id.*).

On December 26, 2017, Carvalho complained to Dr. Nolan about neck pain radiating into the left forearm along with numbness and clumsiness in his left hand.  (R. 456).  However, Dr. Nolan found Carvalho to have a good range of motion in his cervical spine, with his deltoid, biceps, triceps, and extension and flexion of his fingers all normal.  (R. 457).  His biceps and triceps reflexes were also normal.

Regarding Carvalho's lumbar spine, his straight leg raise test was negative and he could stand on his toes and heels and get up easily from a chair.  (*Id.*).  His knee and ankle reflexes were normal, as was his gait.  (*Id.*).

In an appointment on January 25, 2018, Dr. Nolan noted that

he had referred Carvalho to Beth Israel Deaconess Medical Center (Beth Israel) for the second opinion, but that insurance had rejected a request for a cervical MRI.  (R. 458).  Carvalho continued at this visit to complain of pain and numbness in his left arm and a sense of clumsiness in his left hand, but Dr. Nolan found normal strength in Carvalho's deltoid, biceps, triceps, and forearm muscles on both sides, with normal gait.  (*Id.*).

Dr. Nolan noted similar pain complaints by Carvalho on February 28, 2018.  (R. 459).  Because insurance had declined the cervical MRI, Dr. Nolan instead requested another EMG, which was performed on March 14, 2018, and showed "essentially normal" results.  (R. 461).

After Carvalho followed up with Dr. Nolan on March 28, 2018, he had a neurology consultation with Syed Hazique Mahmood, M.D. at Beth Israel on April 3, 2018.  (R. 464, 565-58).  Dr. Mahmood found Carvalho's presentation consistent with lumbar spondylosis and bilateral LS radiculopathy, with his hand numbness and tingling more likely secondary to carpel tunnel syndrome.  (R. 567).  A follow-up was recommended in four weeks to evaluate Carvalho's response to physical therapy and medication.  (*Id.*).

The record does not indicate a follow-up appointment. Instead, Carvalho's next medical procedure appears to have been a cervical spine MRI performed on September 26, 2018.  (R. 446-48). This MRI showed prominent left-lateral disc fragment at C7-T1,

causing severe encroachment on the left neural foramen and moderate encroachment of the left lateral recess; multilevel degenerate disc and joint findings; mild encroachment on the right neural foramen at C4-C5; mild encroachment on the spinal canal and moderate stenosis on the left neural foramen at C5-C6; and mild encroachment of the left neural foramen at C6-C7.  (R. 447-48).

Carvalho was supposed to see Beth Israel neurosurgery on October 4, 2019, but he did not make that appointment.  However, he went to the Beth Israel emergency department later that day for worsening numbness, pain, and weakness in his left arm and hand. (R. 560-64).  The emergency room treated him with medication and a spinal surgeon determined he was not yet a candidate for surgery but should instead receive physical therapy and follow up with neurology a month later.  (R. 563-64).  As advised by the emergency room physician, Carvalho followed up with Dr. Nolan on October 9, 2018.  (R. 467-68).

On November 8, 2018, Carvalho saw Beth Israel neurologist Dr. Kivank Atesok.  (R. 558).  Dr. Atesok recommended a left C7-T1 posterior foraminotomy and microdiscectomy, but Carvalho said he wanted to continue with physical therapy for at least another month.  (R. 558).  However, Carvalho ultimately underwent the recommended surgery at Beth Israel on January 28, 2019.  (R. 472). His surgery was uncomplicated and, although he complained of pain, he was ambulatory and able to get in and out of bed unassisted the

following day.  (R. 474).  He was released from the hospital on January 30, 2019.  (R. 481).

On February 26, 2019, Dr. Nolan completed a Physical Residual Functional Capacity Questionnaire on Carvalho's behalf.  (R. 572). Dr. Nolan opined that Carvalho would not be able to walk a single city block without rest but that he would need to walk for 10 minutes every hour during an 8-hour workday.  He also indicated that Carvalho would not be able to sit for more than two hours at a time, stand for more than 15 minutes at a time, and would need to take unscheduled breaks more than 20 percent of the workday. Finally, he noted that Carvalho should perform no lifting, would have significant limitations on repetitive reaching, handling, or fingering, and would likely be absent from work more than three times per month due to intermittent bad days.  (R. 572-74).

Dr. Nolan also submitted a short letter to the SSA after the ALJ hearing (on April 8, 2019) in response to questions about Carvalho's shoulder impairment.  Dr. Nolan said Carvalho had a very limited range of motion and function in his upper left extremity, including difficulty with repetitive reaching, handling, or fingering.  (R. 575).

## 2.   Medical Opinion Evidence of Non-Examining Doctor

A state medical consultant reviewed Carvalho's records in connection with his reconsideration request for benefits.  In a report dated April 17, 2017, Karen Grande, M.D. found no medically

determinable impairment but nonetheless determined that Carvalho's residual functional capacity would limit him to sedentary work. (R. 90, 92).  In particular, Dr. Grande found that Carvalho could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; and stand or walk for a total of four hours and sit for a total of about six hours in an eight-hour workday.  She also found no limitation on Carvalho's ability to push and pull; climb ramps or stairs; balance; stoop; kneel; crouch; or crawl.  She also noted no manipulative limitations but did recommend that Carvalho avoid concentrated exposure to extreme cold or hazards.  (R. 90-91).

### 3.   __Evidence from the Administrative Hearing__

The ALJ convened an administrative hearing on April 8, 2019, at which the plaintiff and an impartial vocational expert both testified.  Regarding the physical limitations caused by his neck and back issues, Carvalho testified that he had recently had a disc removed and a nerve canal widened to relieve a pinched nerve and alleviate the tingling and numbness in his left hand.  (R. 33-34).  He continued, though, that the numbness and tingling in his fingers did not improve with surgery, and said he walked less and generally did less since the surgery.  (R. 34-35).  Carvalho reported pain radiating to his shoulder and "electric shock" type pain down his spine, and also said he was seeing a pain specialist about the herniated discs in his lower back.  (R. 34-36, 38).

Concerning his carpal tunnel surgery, Carvalho claimed it did

not improve his numbness and tingling.  (R. 38-39).  He also testified that despite two shoulder surgeries, his shoulder would pop when moved, and was painful.  (R. 39).  He reported that Dr. Bickley said he would have to perform another shoulder surgery to determine the source of the problem but also acknowledged that he had not seen Dr. Bickley "for a couple of years."  (R. 39-40).

When asked about his prognosis following his spinal surgery, Carvalho testified that his spinal surgeon said recovery would take a long time but he admitted that the weakness in his left arm had improved somewhat since the surgery.  (R. 40, 44).  Regarding his neck, Carvalho testified that he had trouble concentrating on reading because of neck pain.  (R. 45).

The vocational expert testified and, after being told by the ALJ that Carvalho had no relevant past work, responded to two hypotheticals posed by the ALJ.  First, the ALJ asked if a hypothetical person could perform any work assuming he could not climb ladders, ropes, or scaffolds; and had to avoid unprotected heights and concentrated exposure to cold temperatures and vibrating tools; but otherwise had the following capabilities for a person of his age, education, and background:

> lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting for six hours out of an eight-hour workday; and standing and/or walking for four hours out of the workday.

(R. 51).  This hypothetical apparently was based on Dr. Grande's

assessment.   The expert responded that the person could perform light jobs such as a dispatcher, courier, or storage facility rental clerk.  (R. 51-52).

Second, the ALJ asked the expert to assume the same hypothetical except that the person would be limited to lifting 10 pounds occasionally; lifting less than 10 pounds frequently; and two hours of walking and/or standing.  The expert replied that the person could work in sedentary jobs such as an information clerk, escort vehicle driver, and surveillance system monitor.  (R. 53).

## IV.  THE ALJ'S FINDINGS

On July 5, 2019, the ALJ found that Carvalho was not disabled after conducting the mandated five-step sequential evaluation process.  20 C.F.R. §§ 404.1520(a), 416.920(a).

Step one considers whether the claimant has been engaged during the relevant time period in substantial gainful activity ("SGA"), because a claimant who is so engaged is not disabled.  20 C.F.R. § 404.1520(b).  The ALJ found that the plaintiff had not engaged in SGA since his application date of March 25, 2016.  (R. 17).

Step two considers whether the claimant has a medically determinable impairment that is severe, or a combination of impairments that is severe as defined by the pertinent regulations.  20 C.F.R. § 404.1520 (c).  If so, one moves on to step three; if not, the claimant is not disabled.  Here, the ALJ went on to step

three after finding that the plaintiff suffered from several severe impairments, including cervical degenerative disc disease with left C7-8 radiculopathy, status post foraminotomy and microdiscectomy, and lumbar degenerative disc disease with right L5 radiculopathy. (R. 21).

Step three considers whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 416.920(d), 416.925, and 416.926. If so, the claimant is conclusively presumed to be disabled. If not, one moves to step four. The ALJ found here that the plaintiff's impairments did not meet or medically equal the severity criteria of an impairment listed in the pertinent regulations and accordingly proceeded to step four. (R. 22-23).

Step four considers the claimant's residual functional capacity (RFC) to work and entails a two-part inquiry. In the first part the ALJ determines whether the claimant's RFC allows him to work at all, *i.e.*, whether he has the ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 416.920(f). In the second part the ALJ determines whether the claimant's RFC allows him to perform her past relevant work. 20 C.F.R. § 416.920(f). If the claimant has the RFC to do his past relevant work, he is not disabled. If not, the analysis proceeds to the fifth and final step, which

entails asking whether there are any jobs in the national economy the claimant is capable of performing.

At the first stage of this inquiry the ALJ found that the plaintiff had the RFC to perform light work with the following qualifications: "standing or walking a total of four hours in an eight-hour workday" and "avoid[ing] ladders, ropes, and scaffolds, and concentrated exposure to extreme cold, and hazards, such as unprotected heights, vibration and vibratory tools."  (R. 23).

The ALJ found at the second part of the step four inquiry that Carvalho had no relevant past work.  (R. 26).  Therefore, she proceeded to step five, which considers whether the claimant can perform any other work in the national economy given his RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. (R. 27).  Based on the record and the vocational expert's testimony, the ALJ found that Carvalho could perform light representative occupations such as a dispatcher, courier, or storage facility rental clerk.  (*Id.*).  She further found each of these positions existing in significant numbers in the national economy.  (*Id.*).  The ALJ accordingly determined that the plaintiff was not disabled.  (R. 27-28).

## V.   <u>STANDARD OF REVIEW</u>

A court reviews the findings of an ALJ only to determine whether the findings are supported by substantial evidence, and

whether the correct legal standard was applied.  *Teague v. Colvin*, 151 F. Supp. 3d 1, 2 (D. Mass. 2015).  Substantial evidence to support a decision exists if "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  *Id.*  This court must keep in mind that it is the role of the ALJ, and not this court, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence.  *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).

This court may affirm, modify, or reverse the ALJ's decision, but reversal is warranted only if the ALJ made a legal or factual error in evaluating the plaintiff's claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ.  *Roman-Roman v. Comm'r of Soc. Sec.*, 114 F. App'x 410, 411 (1st Cir. 2004).  This court therefore must affirm the ALJ's decision if it is supported by substantial weight, even if the record could arguably support a different conclusion. *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).  "The ALJ's findings of fact, however, 'are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts.'"  *McCoy v. Colvin,* No. 14-cv-30188-KAR, 2015 WL 4602011, at *2 (D. Mass. July 31, 2015) (quoting *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir. 1999)).  Thus, if the ALJ made a legal or factual error, the court may reverse or

remand for consideration of new material evidence or to apply the correct legal standard.  *See Manso-Pizarro v. Sec'y of Health & Human Servs.,* 76 F.3d 15, 16 (1st Cir. 1996); 42 U.S.C. § 405(g).

## VI.  <u>DISCUSSION</u>

The plaintiff argues that the ALJ erred in two meaningful ways in assessing his RFC: (1) she discounted a favorable medical opinion by his primary care physician, Dr. Nolan and instead substituted her own less favorable lay judgment; and (2) she failed to properly consider or credit the impact of evidence that the plaintiff's impairments would cause him to be absent from work for more than three days a month.  The plaintiff argues that a remand is required to address these errors.  The Commissioner counters that a remand is not warranted because substantial evidence in the record supports the ALJ's determination.  The court first summarizes the ALJ's RFC assessment and then discusses the plaintiff's two claimed assignments of error.

### A. <u>THE ALJ'S RFC ASSESSMENT</u>

In assessing Carvalho's RFC, the ALJ considered two factors: (1) Carvalho's claimed symptoms and the extent to which they were reasonably consistent with the medical and other evidence; and (2) the medical opinion evidence of record.

#### 1.    <u>The Plaintiff's Symptoms</u>

The ALJ evaluated the plaintiff's symptoms by examining his medical records from 2014 to early 2019.  She also considered his

testimony that his surgery had not improved the tingling and numbness in his left hand; he still had considerable neck and shoulder pain; and he had difficulty concentrating because of neck pain. (R. 23-26).

The ALJ found that, while the plaintiff's medically determinable impairments could reasonably be expected to cause his claimed symptoms, the plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical and other evidence before her. (R. 23). The ALJ acknowledged Carvalho's history of back, neck, and left arm pain but noted that in a preoperative assessment just two weeks prior to his January 2019 cervical spine surgery, Carvalho reported living alone in a third-floor unit which he had to climb 26 stairs to access. (R. 25, 556). Carvalho also said he did not use assistive devices and, while he agreed to have a visiting nurse after surgery if home services were necessary, no referral was made. (R. 25). Carvalho denied needing assistance after surgery and said a friend would help him. He also did not perceive any barriers to returning home. (R. 556-57).

The ALJ also noted that the plaintiff was discharged from the hospital two days after his surgery and his records reflected that his pain was well-controlled with medication. (R. 25). While he was told to avoid any heavy lifting or other strenuous activity until his follow-up, he was cleared to take leisurely walks and to

increase his activity at his own pace.  He was scheduled to see his neurosurgeon six weeks after surgery; however, the medical record did not contain any medical treatment notes following his discharge.  (*Id.*).

### 2.  **The Medical Opinions**

With respect to medical opinions, the ALJ considered the assessment of state medical consultant Dr. Karen Grande as well as the functional questionnaire completed by Dr. James Nolan, Carvalho's primary care physician.  The ALJ gave "great weight" to Dr. Grande's evaluation, noting her familiarity with the disability program and support found in the medical evidence for her assessment.  Dr. Grande determined that Carvalho retained the physical capacity to lift 20 pounds occasionally and 10 pounds frequently; stand for four hours and sit for six hours each workday; and be unlimited with regard to pushing and pulling, climbing ramps and stairs, balancing, stooping, kneeling, and crawling.  She found however, that Carvalho should never climb ropes, ladders, or scaffolds, and that he should avoid concentrated exposure to extreme cold and hazards such as machinery and heights. (R. 94-95).

The ALJ explained that, although Dr. Grande's assessment was done in 2017, and Carvalho's condition worsened after that time, "the surgery that was performed in January 2019 was to correct [his pain and weakness in his arm and hand]."  (R. 26).  The ALJ

reasoned that the surgery must have been effective where Carvalho did not return for further treatment or evaluation, stating, "If the claimant did not have relief, then I would expect he would have returned to his surgeon for further evaluation." (*Id.*).  The ALJ noted that the record "lack[ed] any medical treatment notes since his discharge from the hospital following his surgery."  (R. 25).

In contrast, the ALJ gave little weight to the opinion of Dr. Nolan, who said that that Carvalho could sit for only two hours at a time for a total of four hours per workday; stand only 15 minutes at a time for a total of two hours per workday; need to take unscheduled breaks 20% of the time each workday; could never lift any weight or bend or twist at the waist; and would be absent from work more than three times per month.  (R. 576-578).

The ALJ observed that while Dr. Nolan said Carvalho could not walk even a single city block without rest, he also said Carvalho needed to walk 10 minutes per hour.  (R. 25).  She also noted that Dr. Nolan's assessment was done less than one month after Carvalho's surgery, when inferentially he might still be on the road to recovery.  In contrast, the ALJ noted that Dr. Grande's assessment "address[ed] Carvalho's limitations over the period of his application."  (R. 26).

### B.  THE PLAINTIFF'S CLAIMS

Carvalho contends that the ALJ conducted a flawed RFC

assessment because (1) she substituted her own lay opinion for expert medical opinion when she discounted Dr. Nolan's assessment and concluded that Carvalho's 2019 foraminotomy and microdiscectomy had remedied his concededly worsening cervical condition, and (2) failed to recognize that his impairments would cause him to miss at least three days of work a month.  As discussed below, the court finds no basis to upset the ALJ's findings or disability determination.

### 1.  The ALJ did not substitute her own lay opinion for expert medical opinion.

In asserting that the ALJ substituted her lay opinion for medical evidence in determining his RFC, the plaintiff raises two connected arguments.  First, although he concedes that an ALJ can give little or no weight to a treating physician's opinion, he claims that the ALJ gave insufficient reasons here for discounting Dr. Nolan's opinion.  Second, he argues that because Dr. Grande's (less favorable) opinion pre-dated significant deterioration of his cervical spine and his 2019 surgery, her opinion was too stale to serve as the basis for the ALJ's RFC assessment.  The plaintiff reasons that the ALJ necessarily substituted her own opinion where she rejected Dr. Nolan's opinion and could not reasonably rely on Dr. Grande's stale opinion, thus effectively depriving her of any credible medical evidence on which to base her RFC.

The Commissioner counters that the ALJ was reasonably

entitled to give little weight to Dr. Nolan's opinion where his assessment was done less than one month after Carvalho's surgery, when presumably he was still recovering, and thus did not reflect Carvalho's limitations over the course of his application.   The Commissioner argues further that the ALJ had a sufficient basis to conclude that Dr. Grande's assessment accurately reflected Carvalho's post-surgical RFC.   Although Dr. Grande's opinion pre-dated Carvalho's surgery, the record contained no post-operative evidence and was generally devoid of information on how Carvalho's impairments limited his day-to-day functioning.   The court agrees with the Commissioner.

### a. On *Discounting Dr. Nolan's Opinion*

While a treating physician's opinion is "generally" afforded more weight than other sources' opinions, an ALJ is not required to give greater weight to a treating physician's opinion unless it is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in [the] case record."   20 C.F.R. § 416.927(c)(2); *see also Saenz v. Colvin*, 61 F. Supp. 3d 195, 206 (D. Mass. 2014) (quoting *Hughes v. Colvin*, 2014 WL 1334170, at *8 (D. Mass. Mar. 28, 2014)) ("'the law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians, as [they] are granted discretion to resolve any evidentiary conflicts or inconsistencies'").   As such, an ALJ may

give a treating physician's opinion lesser weight or even reject it as long as the ALJ has good reasons for doing so.  20 C.F.R. § 416.927(c)(2).

Carvalho concedes that the ALJ had the discretion to discount Dr. Nolan's opinions but contends that she did not give good reasons for doing so.  Carvalho asserts that the only explanation the ALJ gave for discounting Dr. Nolan's assessment was that it was completed just one month after his surgery and that, just prior to his surgery, Carvalho said he was able to climb stairs to get to his apartment and would be able to function post-operatively with the help of a friend.

The court finds no basis to take issue with the ALJ's treatment of Dr. Nolan's assessment.  The ALJ acknowledged Dr. Nolan's assessment but explained, reasonably in the court's view, that she gave it less weight because when considered in light of other preoperative evidence in the record, Dr. Nolan's assessment did not appear to accurately assess Carvalho's capacity.  In that regard, the ALJ thoroughly reviewed the medical evidence regarding Carvalho's back pain and noted that that he was able in December 2017 to stand on his heels and toes, get up easily from a chair, and walk normally.  (R. 24).  Further, even when evaluated at Beth Israel in April 2018, where he reported his pain as a 7-9/10, his exam showed a negative straight leg raise test and he was referred for physical therapy rather than surgery.  (*Id.*).

23

Similarly, concerning Carvalho's radiating neck and arm pain and weakness, the ALJ acknowledged that he had exhibited weakness in his wrist and fingers as late as September 2018, just four months before he had his surgery, but noted that an evaluation conducted by Beth Israel physician Dr. Brooke Lubinski on October 4, 2018, opined that he did not need surgery but rather should complete a month of physical therapy and then return for an evaluation by at their spinal clinic. (*Id.*; R. 567-68).  It was only after "failing conservative treatment" that he underwent the foraminotomy and microdiscectomy.

Against this backdrop, the ALJ did not consider Dr. Nolan's RFC assessment to be an accurate reflection of Carvalho's RFC over the period of time dating back to his application for benefits, that is, March 2016.  (R. 26).  Likewise, she did not consider Dr. Nolan's opinion regarding Carvalho's shoulder issues to warrant great weight because the record reflected that he had received no follow-up treatment for his shoulder since 2017.  In essence, the ALJ determined that an assessment based on the evidence in the record going back to the time of Carvalho's application was more probative than Dr. Nolan's assessment done just after the plaintiff had undergone surgery and might still be in the course of recovery.

This court declines to second guess the ALJ's weighing of the various pieces of evidence.  *See Quaglic v. Colvin*, 52 F. Supp. 3d 323, 334 (D. Mass. 2014) (even where a different outcome is

possible, court cannot second-guess an ALJ who has an adequate basis for a conclusion).  While Dr. Nolan's assessment may have reflected an accurate description of what Carvalho could do right after surgery, there was sufficient evidence for the ALJ to conclude that it did not accurately reflect Carvalho's RFC overall. *See Suzanne B. v. Comm'r*, No. 1:17-CV-3089-TOR, 2019 WL 7816824, at *5 (E.D. Wash. July 19, 2019) (no error where ALJ discounted treating physician's severe limitations because they incorporated immediate post-operation limitations less than a month after back surgery).

### b. On According Great Weight to Dr. Grande's Opinion

Carvalho argues independently that the ALJ erred in giving great weight to Dr. Grande's assessment.  As noted above, the ALJ gave great weight to Dr. Grande's assessment, completed in 2017, because of her familiarity with the disability program and because it was supported by the medical evidence in the record.  Carvalho maintains that Dr. Grande's assessment could not possibly accurately reflect his functional impairments where his condition subsequently deteriorated to the point that he underwent cervical spinal surgery in January 2019.  The court acknowledges that the plaintiff unquestionably experienced additional medical issues following Dr. Grande's assessment, but this fact does not cause the court to question the reasonableness of the weight the ALJ accorded her assessment.

To be sure, when an applicant undergoes medical treatment or evaluation after a state consultant has done a disability evaluation, the consultant's opinion cannot serve as substantial evidence if it is based on a significantly incomplete record. *Alcantara v. Astrue*, 257 F. App'x 333, 334 (1st Cir. 2007); *Roshi v. Comm'r of Soc. Sec.*, 14-cv-10705-JGD, 2015 WL 6454798, at *12 (D. Mass. Oct. 26, 2015). However, if the information in the evidence the consultant considers remains accurate, an ALJ may rely on the consultant's opinion notwithstanding that new evidence has since been submitted. *See Blackette v. Colvin*, 52 F. Supp. 3d 101, 113 (D. Mass. 2014); *Abubakar v. Astrue*, No. 11-cv-10456-DJC, 2012 WL 957623, at *12 (D. Mass. Mar. 21, 2012); *Mary Christine K. v. Comm'r of Soc. Sec.*, No. 18-cv-004-CJP, 2018 WL 4144507, at *5 (S.D. Ill. Aug. 30, 2018) (ALJ could rely on earlier reports where additional records contained nothing qualifying as "new, significant, and potentially decisive"); *Ferland v. Astrue*, No. 11-cv-123-SM, 2011 WL 5199989, at *4 (D.N.H. Oct. 31, 2011) (state examiners' assessments may be relied upon if arguably consistent with newer records). Accordingly, a medical opinion is not stale or unreliable merely because it predates other evidence in the record as long as the subsequent evidence does not undermine the opinion evidence. *Davis v. Comm'r of Soc. Sec.*, No. 18-CV-194P, 2019 WL 4315749, at *4 (W.D.N.Y. Sept. 12, 2019).

Here, while the fact that Carvalho underwent cervical spinal

surgery after seeing Dr. Grande arguably could be seen as a new and significant development calling her evaluation into question, *see, e.g., Nagy v. Saul*, No. 19-CV-300-MJR, 2020 WL 3118569, at *5 (W.D.N.Y. June 12, 2020) ("in considering whether a medical opinion is stale, courts have frequently pointed to surgeries occurring subsequent to the . . . opinion as evidence of the claimant's deteriorating condition"), the critical question is whether the subsequently added medical evidence establishes any greater limitations than those assessed by the state examiner. *See Harding v. Colvin*, Civ. A. No. 12-11437-DJC, 2015 WL 8082386, at *12 (D. Mass. Dec. 7, 2015); *D.A. v. Colvin*, No. 11-cv-40216-TSH, 2013 WL 5513952, at *8 (D. Mass. Sept. 30, 2013).  Although Carvalho unquestionably experienced additional issues following Dr. Grande's assessment, the medical evidence reflects that his cervical spine issues were exacerbated for only a short period— from September 2018 to his surgery in January 2019, and the record is simply devoid of any post-surgical medical records.  Further, the testimony that Carvalho had just one follow-up appointment and one physical therapy session between his surgery in January 2019 and the administrative hearing in early April reasonably supported an inference that the surgery was successful and his recovery was proceeding satisfactorily.  In context, then, the ALJ's decision to assess an RFC consistent with Dr. Grande's opinion was reasonable where it was consistent with the evidence up to that

point and there was scant evidence thereafter to support a finding of more serious functional impairments.

In light of the foregoing, the court cannot find that the ALJ erred in placing great weight on Dr. Grande's assessment and determining that Carvalho's RFC was no less than Dr. Grande concluded.  While the ALJ acknowledged the deterioration of Carvalho's cervical spine and the fact that he eventually warranted surgery (R. 24-25), she noted that he had not exhibited the more pronounced symptoms of his cervical spine issues, such as weakness and numbness in his left hand, until September 2018.  (R. 24).  He underwent cervical surgery just four months later, and there is no indication in the record that the limitations placed on him post-surgery would still be in place such that his impairment from his acute symptoms would be expected to last at least 12 months as required for a finding of disability.

To the extent Carvalho argues that the ALJ nonetheless went too far in simply inferring that the absence of records or evidence suggested that his recovery from cervical spine surgery was proceeding satisfactorily, the court does agree that this inference, while not unfounded, was also not necessarily the only plausible inference that could be drawn.  Still, the court does not find the ALJ's characterization to amount to a substituted lay opinion warranting reversal, particularly where Dr. Grande's assessment was consistent with the overall record and Carvalho did

not produce records or evidence following the surgery to show that his condition had continued to deteriorate. *See Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001); *see also Gaeta v. Barnhart*, Civ. A. No. 06-10500-DPW, 2009 WL 2487862, at *6 n.4 (D. Mass. Aug. 13, 2009) (under 20 C.F.R. § 404.1512(a), claimant is required to produce all evidence supportive of claim).

To be sure, Carvalho argues that supporting evidence regarding his recovery was generated past the cut-off date for submitting evidence, but there is no indication that Carvalho, who was represented by counsel, sought leave to submit this evidence. Where claimants fail to produce additional evidence to support their claim of disability, an ALJ can logically conclude that "further records do not exist, are unhelpful, or are unimportant." *Gaeta*, 2009 WL 2487862, at *6 n.4. Further, when the only medical evidence submitted post-surgery indicates a normal recovery, an ALJ is entitled to conclude that the surgery has been successful. *See Meyer v. Astrue*, No. 3:09-cv-137-WGH-RLY, 2011 WL 672630, at *7 (S.D. Ind. Feb. 17, 2011) (where claimant underwent lumbar surgery just three months prior to the ALJ's ruling and the only post-surgical evidence indicated that the plaintiff was getting around well two weeks after surgery, the ALJ was "free to conclude that Plaintiff's . . . surgery was a success and that Plaintiff failed to provide objective medical evidence that contradicted this conclusion"). Here, the only evidence indicated that the

surgery was uneventful, and that Carvalho understandably had pain but could already get in and out of bed by himself the following day.  (R. 478-79).

Finally, the court notes that the record contains very little information on how Carvalho's impairments affected his day-to-day functioning.  Other than knowing he could appear to climb several stairs and apparently did not need home nursing care after his surgery, the ALJ had little information on the plaintiff's ability to reach shelves, carry groceries and packages, insert his keys into a lock, etc.  Apparently, the SSA contacted Carvalho several times about submitting a functioning report but he never submitted one.  (R. 254, 265, 267).  Under such circumstances, the ALJ was not unjustified in concluding that Carvalho's surgery would ultimately leave him no less limited than Dr. Grande had found.[2]

### 2.   <u>The ALJ's considered Dr. Nolan's opinion on work absences but had substantial evidence to discount it.</u>

Carvalho contends that the ALJ erred in ignoring Dr. Nolan's uncontroverted assessment that Carvalho would be off-task more than 20% of the workday and be absent from work more than two to

---

[2] Carvalho also argues that the ALJ erred in dismissing Dr. Nolan's post-hearing letter regarding limits on Carvalho's "upper left extremity."  While Carvalho cites his continuing issues with hand and finger tingling and numbness, it appears that the ALJ regarded "upper left extremity" as concerning Carvalho's shoulder issues.  In that regard, the ALJ noted that Carvalho had not had a follow-up on his shoulder since 2017, and no functioning limitations were prescribed on a 12-month basis of permanent duration.  (R. 22).  These were sufficient reasons to discount significant limitations based on Carvalho's shoulder issues.

three days per month due to his impairments.  Carvalho contends
that this error requires reversal where the vocational expert
testified that someone with those limitations would not be able to
work.  (R. 57).  Carvalho cites *Walker v. Barnhart*, No. 04-cv-
11752-DPW, 2005 WL 2323169 (D. Mass. Aug. 23, 2005) in support of
this contention.  In *Walker*, the court vacated and remanded the
Commissioner's finding that the claimant was not disabled after
finding that the ALJ had failed when assessing the RFC to accept
or explicitly discredit a treating source's assessment that the
claimant would be absent more than three days a month.  This error
was particularly significant where the claimant similarly
testified that she had five bad days per month.  *Id.*

Here, however, the ALJ did consider Dr. Nolan's opinions about
work breaks and absences but rejected them where they came just
one month after Carvalho's cervical spine surgery when he was still
in the course of recovery.  (R. 26).  Further, Carvalho did not
testify that he would need to take particularly long or frequent
breaks or that he would miss days of work due to his pain.  As
discussed above, the ALJ conducted a thorough review of Carvalho's
medical history, and she did not err in concluding that Dr. Nolan's
findings on breaks and absences were not consistent with Carvalho's
limitations over the period of his application.  (R. 25-26).

## VII. <u>CONCLUSION</u>

For the foregoing reasons, the plaintiff's Motion to Reverse the Decision of the Commissioner (D. 18) is **<u>DENIED</u>** and the Defendant's Motion to Affirm the Commissioner's Decisions (D. 21) is **<u>GRANTED</u>**.

/s/ Donald L. Cabell<br>
DONALD L. CABELL, U.S.M.J.

DATED:  September 30, 2021